WO

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Jill Larson and Robbin Larson, husband and wife,

          Plaintiffs,

v.

Clarence Dupnik, Pima County Sheriff; Jeffrey Reay, Pima County Sheriff's Deputy; Joseph Serrano, Pima County Sheriff's Deputy; Ramon Penunuri, Pima County Sheriff's Deputy; William Fosmire, Pima County Sheriff's Deputy; and Michael McMurrich, Pima County Sheriff's Deputy,

          Defendants.

CV 14-1592 TUC DCB

**O R D E R**

For the reasons explained below, the Court denies the parties' cross-motions for summary judgment and sets the case for trial.

Plaintiffs allege Defendants violated his Fourth and Fourteenth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures because Defendants forced Plaintiffs from their home at gun point, handcuffed them, held them for approximately 45 minutes, and searched their home, without probable cause or a warrant.

Plaintiffs file a Motion for Partial Summary Judgment (MPSJ), and Defendants file a Motion for Summary Judgment (MSJ), which are essentially crossmotions for summary judgment of the case. *See* (Reply to support MSJ (Doc. 60) at 2 (relying on Response and SOF to MPSJ (Docs. 57-58)); Response to MSJ (Doc. 54) at 5 (relying on MPSJ (Doc. 47)). The question of whether any constitutional violation occurred is found in Plaintiffs' MPSJ,

which is partial only to the extent Plaintiffs did not brief the Defendants' assertion of qualified immunity. Defendants responded by filing both a Response and by filing a Motion for Summary Judgment asserting qualified immunity. Plaintiffs replied both in a Response to the Defendants' Motion for Summary Judgment and in a Reply supporting their Motion for Partial Summary Judgment.

Given there has been ample opportunity to brief the issues, the Court denies the Defendants' request for oral argument. The parties submitted memoranda thoroughly discussing the law and evidence in support of their positions, and oral argument will not aid the court's decision-making process which is entirely based on a question of law. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memoranda of the law and evidence in support of their positions, ordinarily oral argument would not be required).

The Court finds Defendants are not entitled to qualified immunity based on the facts viewed in the light most favorable to the Plaintiffs. The Court denies Defendants' Motion for Summary Judgment. The Court finds that there are material questions of fact in dispute regarding what occurred on the night of May 23, 2013, which preclude summary judgment for the Plaintiffs. The Court sets the case for trial.

**May 23, 2013: Plaintiffs' allegations**

On Thursday night, May 23, 2013, at approximately 10pm, the Plaintiffs were sleeping in their home when the five Defendant Sheriffs arrived, summoned pursuant to a 911 call from their neighbor, who was mentally unstable, reporting that he had heard shots and screams coming from their trailer. (MPSJ (Doc. 47), Statement of Facts (Ps' SOF) (Doc. 53)[1] ¶¶ 32-51). Over the month proceeding the false report directed at the Plaintiffs, the neighbor had made seven false reports to police, *id.* ¶ 9, that he had heard gunfire, that neighbors

---

[1]Defendants make numerous objections to Plaintiffs SOF that cited deposition pages do not support the statement. The Court reviewed the cited depositions and found them to be accurate support for the statements relied on by the Court in this decision.

2

were targeting him with lasers, and he heard persons screaming outside, *id.* ¶ 10.  Sheriffs had transported him to the Community Partnership of Southern Arizona Crisis Response Center for a psychiatric evaluation. *Id.* ¶ 17.  Two days before the false report about Plaintiffs, Sheriffs contacted Southern Arizona Mental Health Center to obtain mental health services for the neighbor. *Id.* ¶¶ 18-23.  "As of May 21st 2014, at least eighteen (18) different PCS deputies had had interactions with [the Plaintiffs' neighbor] in the previous seven (7) months," *id.* ¶ 24, including 3 of the officers, Reay, McMurrich and Salica,[2] who responded to the Plaintiffs' house that night, *id.* ¶¶ 9, 26.

All this information had been logged into the FORCE database, which tracks every incident and interaction between deputies and callers, suspects and others.  *Id.* ¶ 4.  Defendants knew of the instant availability of the FORCE database, which is designed so that the 911 call-taker, the dispatcher, or any deputy in his or her cruiser can call up the database. *Id.* ¶ 7.  The FORCE data base reflected that the Plaintiffs' neighbor was tagged: "CAUTION ALERT"; "CAUTION - THREAT TO LAW ENFORCEMENT." *Id.* ¶ 8.  During the 12 minutes it took to respond to the 911 call, *id.* ¶ 53, Defendants could have, should have, and failed to checked the FORCE database.

Because none of the Defendants checked the FORCE data base, when they arrived at the Plaintiffs home they believed a neighbor, living across the street, had heard horrible screaming and yelling between a man and a woman, and what sounded like gunshots and that the neighbor was staying on the telephone with the 911 call-taker, continuing to report what he was hearing next door at the Plaintiffs' home, *id.* ¶ 29-57, and was willing to speak to officers responding to the report, *id.* ¶ 56.

Eight cruisers and the five Sheriff Defendants, *id.* ¶54, arrived with their sirens off, *id.* ¶ 55, to a quiet neighborhood, *id.* ¶ 58 . Two sergeants also arrived, *id.* ¶ 54; they are not named Defendants.  When Defendants arrived, there were no dogs barking, no shouting, no

---

[2]Officer Salica is not a named Defendant.

breaking glass, and no thuds. *Id.* ¶ 58. The Plaintiffs' home was dark, *id.* ¶ 64, with their dogs standing silently inside a high chain link fence that surrounded the Plaintiffs' property, *id.* ¶¶ 60 68. Defendants illuminated Plaintiffs' yard with their cruiser spot lights. *Id.* ¶ 65. Two Defendants pulled out AR-15 assault rifles, *id.* ¶ 62, the other three unholstered their semi-automatic pistols, *id.* ¶ 63. In route, Defendant Reay had called "move in and hold off," which means wait and gather more information, *id.* ¶ 66, but instead the Defendant Sheriffs surrounded the house, *id.* ¶¶ 69, 70.

Sheriffs roused the Plaintiffs from sleep by screaming and banging on the side of their trailer home. *Id.* ¶3. Plaintiffs came to the door, *id.* ¶¶ 78-79, and when they opened it, Defendants were pointing guns, including assault rifles, at the Plaintiffs, *id.* ¶¶ 78-79. According to the Defendants, both Plaintiffs appeared to have been just wakened from sleep. *Id.* ¶ 83. Defendants ordered Plaintiffs from their home at gunpoint, *id.* ¶¶ 84-85, off their porch with their hands-up into their yard, *id.* ¶¶ 78-81, where Defendants handcuffed them, *id.* ¶ 87. All the while, Defendants pointed assault rifles at them, *id.* ¶¶ 78-79, and one officer was shaking so much that the barrel of his rifle was shaking, *id.* ¶¶ 84-85, and Plaintiffs believed they would be shot if they so much as stumbled coming down the steps from the trailer to the yard. *Id.* ¶ 84. Plaintiffs were terrified and feared for their lives. *Id.* ¶ 85.

Plaintiffs were nearly naked and barefoot. *Id.* ¶ 82. Defendants admitted they could see that neither Plaintiff was armed or injured. *Id.* ¶ 88. Defendants asked if anybody else was in the house and that Sheriffs had been advised there was a report of a potential shooting at their location. *Id.* ¶ 86. Plaintiffs told the Sheriffs that there was nobody else in the house and they had not heard anything. *Id.* ¶ 86. Nevertheless, Plaintiffs were walked barefoot across their yard, in handcuffs, to a patrol vehicle outside the enclosed yard. *Id.* ¶ 89. Plaintiffs allege they suffered cuts and scrapes on the bottom of their feet. *Id.* ¶ 98. Plaintiffs allege they were held by the road-side at the cruiser in handcuffs and questioned for at least

15 minutes, *id.* ¶ 102, while Sheriffs searched their home without a warrant, without asking for consent, *id.* ¶ 92, and without mentioning there was a need to see if there was a gunshot victim inside in need of aid, *id.* ¶ 93.

While Sheriffs questioned Plaintiffs, a man appeared from the bushes on the opposite side of the road and told Sheriffs he had called them and if the gunshots were not from Plaintiffs' house, it was the house next door. *Id.* ¶ 103-105. By then, Sheriffs were completing the "callout and containment" action, *id.* ¶ 72, they were finishing clearing Plaintiffs' home, *id.* ¶ 94-95, and moved next door where they followed the same procedure of removing the family (a woman, her daughter, and friend) at gunpoint, handcuffing and holding them while they searched that house, without a warrant. *Id.* ¶ 110.

"Only then, as Serrano reported, "it was discovered that the reportee might possibly suffer from mental illness and the entire incident might have been made up." *Id.* ¶ 111 (Ex. 17 Doc. 40-4 at 12). And, it was then that Defendants released Plaintiffs from custody. *Id.* ¶ 112. Total, Plaintiffs were held for approximately 45 minutes at the front of their property, face forward against a patrol cruiser, illuminated by spotlights without any clothes to cover themselves or shoes for their feet. (Larson, R. Depo. (Doc. 38-1_ at 25.)

**Cross-motions for Summary Judgment: standard of review**

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is any factual dispute that might effect the outcome of the case under the governing substantive law. *Id.* at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the non-moving party. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *Liberty Lobby, Inc.*, 477 U.S. at 250. "If evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Eisenberg v. Insurance Co. of North Am.*, 815 F.2d 1285, 1288 (9th Cir. 1987).   In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986).

On cross-motions for summary judgment, the Court considers each party's evidence, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011), but does not weigh the evidence, determine the truth of the matter, or determine credibility, *Liberty Lobby, Inc.*, 477 U.S. at 252.   The Court determines whether there is a genuine issue for trial.   *Id.* The inquiry mirrors the standard for a directed verdict: whether the evidence presented reveals a factual disagreement requiring submission to a jury or whether evidence is so one sided that one party must prevail as a matter of law.   *See*, *Celotex Corp.*, 477 U.S. at 323 (citing *Liberty Lobby*, 477 U.S. at 250) (essentially, the standard for granting summary judgment mirrors that for a directed verdict).

**Qualified Immunity**

42 U.S.C. § 1983 imposes individual liability on a government officer for actions taken under color of state law which deprives a plaintiff of a right or privilege guaranteed by the Constitution or laws of the United States.   *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Even if § 1983 liability attaches, however, Defendants may be immune from suit under the doctrine of qualified immunity.   A government employee is not personally liable for an abuse of

discretion violating civil rights unless the legal right was "clearly established" at the time, and a reasonable person in the same position would have known that what he did violated that right. *Behrens v. Pelletier*, 516 U.S. 299, 304 (1996); *Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1996); *Trevino v. Gates*, 99 F.3d 911, 916 (9th Cir. 1996),*cert. denied*, 117 S. Ct. 1249 (1997); *Act Up/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993).

Qualified immunity is designed to protect an officer who, reasonably, but mistakenly, acts in violation of some constitutional right. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  The doctrine bars the suit; it is not a defense to liability. *Act Up/Portland*, 988 F.2d at 872-73. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is a legal question, and it is addressed by the Court at the earliest possible point in the litigation. *Act Up/Portland*, 988 F.2d at 872-73.

While a decision on the merits of the constitutional claim and the qualified immunity analysis in some parts may overlap, the assessments are not merged because the qualified immunity analysis is based on the facts as alleged by the plaintiff, whereas the plaintiff has to prove the merits of his constitutional claim at trial. See *Saucier,* 533 U.S. at 200-201 (the analyses are not susceptible to fusion).

Plaintiff bears the burden of showing that the rights he alleges the Defendants violated were clearly established. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  Defendants bear the burden of showing that a reasonable officer could have believed he was not violating a constitutional or statutory right. *Collins*, 110 F.3d at 1369 (citing *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994), *cert. denied, Ball v. Gasho*, 515 U.S. 1144 (1995)).  In other words, qualified immunity requires the Defendants to prevail regarding the reasonability of their conduct based on the facts as alleged by the Plaintiffs and construed in Plaintiffs favor.

1    Under the Fourth Amendment, the Court looks for "objective reasonableness."

2  *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Robinson v. Solano Cnty.*, 278 F.3d 1007,

3  1013–14 (9th Cir.2002). The inquiry is a fact-intensive balancing of "the nature and quality

4  of the intrusion on the individual's Fourth Amendment interests against the countervailing

5  government interests at stake." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir.2003).

6    In the Ninth Circuit, the courts evaluate "the severity of the crime at issue, whether

7  the suspect poses an immediate threat to the safety of the officers or others, and whether he

8  is actively resisting arrest or attempting to evade arrest by flight." *Robinson*, 278 F.3d at

9  1014 (citing *Graham*, 490 U.S. at 396). The courts consider whether the suspect poses an

10  immediate threat to the safety of the officers or others to be the "most important" *Graham*

11  factor. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.2005). The courts look at the total

12  "quantum of force" involved, the availability of alternative methods of detaining the suspect,

13  and the arrestee's mental and emotional state. *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th

14  Cir.2010).  Moreover, "[t]hese factors ... are not exclusive. Rather, [courts] examine the

15  totality of the circumstances and consider whatever specific factors may be appropriate in

16  a particular case [.]" *Mattos v. Agarno*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Bryan v.*

17  *MacPherson*, 630 F.3d 805, 826 (9th Cir.2010)) (internal quotation marks omitted).

18  Reasonableness is evaluated "from the perspective of a reasonable officer on the scene, rather

19  than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

20    For purposes of qualified immunity, reasonableness, usually a question of fact, may

21  be decided as a matter of law "if, in resolving all factual disputes in favor of the Plaintiff,"the

22  court can find the officer's conduct was "objectively reasonable." *Jackson v. City of*

23  *Bremerton*, 268 F.3d 646, 651, n. 1 (9th Cir. 2001) (citations omitted). Given the fact specific

24  nature of the reasonability analysis, unless the determination can be made in the context of

25  the one-sided factual inquiry for determining qualified immunity, summary judgment should

26

27

28                                          8

be granted sparingly. *Boyd v. Benton Cnty.*, 374 F.3d 773, 778–79 (9th Cir.2004); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir.2000).

### Fourth Amendment constitutional rights

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Plaintiffs complain they were subjected to both: an unreasonable seizure and unreasonable search of their home.

Defendants argue they were subjected to neither. Defendants assert Plaintiffs' constitutional rights were not violated because they were only temporarily detained to ensure officer safety and their home was searched under emergency circumstances because Sheriffs believed there might be a gun-shot victim or shooter inside the Plaintiffs' trailer.

The reasonableness of a warrantless arrest is determined by the existence of probable cause. *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990). "Probable cause exists when, at the time of arrest [or search], the agents know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1296 (9th Cir. 1988). By definition, probable cause can only exist in relation to criminal conduct. *Allen v. Portland*, 73 F.3d 232 (9th Cir. 1996). "It is well established that "'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133 (Calif. 2010) (quoting *LaLonde*, 204 F.3d at 954 (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)).

The presumption of unreasonableness can be rebutted by one of two narrow exceptions: exigency and emergency. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). Both are "narrow and their boundaries are rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home." *United States v. Stafford*, 416 F.3d 1068, 1068, 1073 (9th Cir. 2005).

The two exceptions serve very different needs. The "'emergency' exception stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb; this exception does 'not [derive from] police officers' function as criminal investigators.'" *Hopkins*, 573 F.3d at 763 (citing *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir.2000) (abrogated on other grounds)). "By contrast, the 'exigency' exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent ... the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *Id.* (citing *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc)).

Defendants assert they acted pursuant to the emergency exception. It is undisputed that no probable cause existed in this case. "Because it is 'clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause **and** the existence of exigent circumstances,'"  . . ., [the Defendants are not entitled to qualified immunity based on exigency and can prevail on summary judgment only if ] "they can demonstrate that they entered the curtilage[3] or the house pursuant to the [] emergency aid exception to the warrant requirement." *Sandoval v. Las Vegas Metro. Police Dept.*, 756 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001)).

---

[3]The Fourth Amendment extends to areas in which a person has a reasonable expectation of privacy including the curtilage to a home, which for most homes will be clearly marked as the area around the home to which the activity of the home life extends. *United States v. Struckman*, 603 F.3d 731, (9th Cir. 2010) (citing *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979); *Oliver v. United States*, 466 U.S. 170, 180 (1984).  For example, a backyard adjacent to a home, small and enclosed, is unquestionably such a clearly marked area to which the activity of home life extends.  *United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003).  A porch, adjacent to Plaintiffs' door to trailer door is unquestionably curtilage.

"[Until] *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), [] case law considered officer safety as part of the exigency exception, 'for which probable cause is a prerequisite.'" *Sandoval*, 756 F.3d at 1165-64 (citing *see e.g., United States v. Brooks*, 367 F.3d 1128, 1133 n.5, 1135 (9th Cir. 2004)). "Following *Brigham City*, the cases counsel that officer safety may also fall under the emergency rubric." *Id.* (citing *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir.2008) (holding that threat to officer safety falls under the emergency exception requirement); *see also Ryburn v. Huff* , 132 S.Ct. 987, 990–91 (2012) (finding *Brigham City* and related decisions "to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence")).

This is important because it means that the Court does not need to consider Defendants' assertions that for officer safety reasons Plaintiffs could be detained on the basis of "reasonable suspicion," rather than probable cause.[4] Instead, under *Brigham City*, *Snipe*, and *Sandoval*, the Court considers whether the Defendants had an objectively reasonable

---

[4] The Court does not need to consider Defendants' argument that Plaintiffs admit they only heard generalized banging on the side of their trailer and did not hear Sheriffs identify themselves, therefore, Plaintiffs opened the door voluntarily, without any police coercion, and an arrest is deemed to have not occurred inside a home when persons voluntarily expose themselves to law enforcement because such persons have subjected themselves to being detained based on reasonable suspicion. (Response to MPSJ(Doc. 57) at 12 (citing *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985); *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980); *United States v. Vaneaton*, 49 F.3d 1423, 1426-27 (9th cir. 1995); *United States v. Casper*, 472 F.3d 1141, 1148 (9th Cir. 2007).

The Court does not consider Defendants' argument that Plaintiffs's seizure was based on the lesser "reasonable suspicion" standard for investigatory stops. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Whether or not there was reasonable suspicion to conduct an investigatory seizure is not relevant, here, where the inquiry is whether Defendants had an objectively reasonable belief the Plaintiffs were an imminent threat to officer safety. Likewise, not relevant to officer safety are the Defendants' assertions of investigatory exigency: that they temporarily seized the Plaintiffs because they might flee or suddenly become non-compliant and fight with a deputy.

1    basis for concluding that there was an imminent threat of violence, i.e., "an immediate need
2    to protect [] themselves from serious harm." *Sandoval*, 756 F.3d at 1164-65 (quoting *Snipe*,
3    515 F.3d at 952)).

4         In short, whether Defendants are entitled to qualified immunity depends on whether
5    the Defendants had a reasonable basis for concluding that there was an imminent threat of
6    violence to their safety and the safety of others to justify the Plaintiffs' detention and the
7    warrantless entry into Plaintiffs' home. *Sandoval*, 756 F.3d at 1163-64.

8                        <u>Illegal arrest or temporary detention for officer safety</u>

9         To determine whether Defendants violated Plaintiffs' constitutional right to be free
10   of any seizure without probable cause, the Court must address two issues: 1) whether the
11   Defendants arrested the Plaintiffs, and 2) whether the arrest was supported by probable cause
12   to believe that the Plaintiff had committed a crime. *Henry v. United States*, 361 U.S. 98, 102
13   (1959).  Here, the second prong is undisputed: there was no probable cause to believe
14   Plaintiffs committed any crime.  The sole question is whether Plaintiffs were arrested.
15   Defendants assert they were not, but were merely detained for officer safety reasons.

16        To determine whether a seizure has ripened into a full-scale arrest, the Court
17   considers the totality of the circumstances. *United States v. Del Vizo*, 918 F.2d 821, 824 (9th
18   Cir. 1990).  The Court places itself in the position of the Plaintiffs, to determine whether a
19   reasonable innocent person in these circumstances would **not** have felt free to leave after a
20   brief period of time. *Delgadillo-Velasquez*, 856 F.2d at 1295-96 (distinguish between arrest
21   and investigatory stop by determining whether reasonable person would have felt free to
22   leave after brief period of questioning).

23        It is undisputed that the Plaintiffs opened their front door to face two AR-15 assault
24   rifles and an automatic handgun.  They were ordered out of their house, with their hands up
25   and the guns pointed at them, off their porch and were handcuffed.  They were not allowed
26   to put clothes or shoes on.  They were taken to the front of their property placed up against

27

28                                                    12

a police cruiser, facing the vehicle, and were questioned for approximately 15 minutes. They were detained for about 45 minutes.

The Defendants are correct that under the totality-of-the-circumstances standard, neither the fact that Defendants used aggressive force, drawn weapons and handcuffs, is dispositive. *Del Vizo*, 918 F.2d at 824.  But in looking at the totality of the circumstances, the Court considers the intrusiveness of the stop (i.e., the aggressiveness of the police methods and how much the Plaintiffs' liberty was restricted). *Washington v. Lambert*, 98 F.3d 1181, 1185-1186 (9th Cir. 2009) (citing *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987), *see also generally Terry v. Ohio,* 392 U.S. 1, 23 (1968) (officers may take steps necessary to protect themselves when they have adequate reason to believe that stopping and questioning the suspect will pose particular risks to their safety).  The Court also considers the justification for the use of such tactics (e.g., whether the officer had a reasonable basis to fear for his safety to warrant the intrusiveness of the action take).  *Id.* (*citing United States v. Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir. 1983) (per curiam)).  In other words, there is no particular police conduct, such as pointing weapons, handcuffing, or placing someone in a police car, that "automatically" converts an investigatory stop into an arrest, requiring probable cause.  *Lambert*, 98 F.3d at 1186.  The Court determines whether the police action constitutes an arrest or something less by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable given the specific circumstances of the seizure. *Id.* (*citing Del Vizo*, 918 F.2d at 824-25) (comparing *Terry* stop with full blown arrest).

The Court considers whether the circumstances of officer safety warranted the Defendants' aggressive use of force.[5]  It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, even stopping them at gunpoint and handcuffing them, are reasonable.

---

[5]Plaintiffs did not allege a separate cause of action based on excessive use of force.

*Alexander*, 64 F.3d at 1320 (citing *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (where officers knew a suspect had violent criminal history, it was not impermissible to stop him at gunpoint and force him to lie down); *United Sates v. Bautista,* 684 F.2d 1286, 1289-90 (9th Cir. 1982) *cert. denied*, 459 U.S. 1211 (1983) (handcuffing justified by possibility that another suspect lurked in the vicinity); *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990)) (no *per se* rule that detention in patrol car constitutes an arrest)).

The Plaintiffs do not dispute that when Defendants arrived at their home Defendants believed screaming and yelling, violent threats, and gunshots had been reported by a neighbor as being heard emanating from their home.  The Defendants argue that they were entitled to rely on the 911 call by Plaintiffs' neighbor reporting a violent altercation at Plaintiffs' trailer. In the Ninth Circuit, 911 calls are deemed to have sufficient indicia of reliability because 911 calls are made by persons willing to identify themselves and make a record of their report, which is usually relayed  as a first-hand report of a contemporaneous emergency.  (MSJ (Doc. 49)  (relying on *United States v. Terry-Crespo*, 356 F.3d 1170, 1173-74 (9th Cir. 2004)).  These factors distinguish a 911 call from an anonymous tip, which must be verified or corroborated.  *Terry-Crespo*, 356 F.3d at 1174-78.  In *Terry-Crespo*, the court held there is no constitutional requirement to verify a 911 call, and standing alone a 911 call may be sufficiently reliable to provide reasonable articulable suspicion to justify a *Terry* stop. *Id.* at 1176. The logic set out in *Terry-Crespo* supports the conclusion that a 911 call is sufficiently reliable to provide a reasonable articulable basis for Sheriffs to believe there was an imminent threat of violence.

Even emergency calls not reported on a 911 line can have indicia of reliability to form a basis for a police officer to reasonably believe the caller had an emergency.  *Snipe*, 515 F.3d at 953.  In *Snipe*, the court rejected the notion that police could not rely on an emergency tip where the caller's identity or the facts being reported could not be verified because this would dramatically slow emergency response time and be at odds with the

1    purpose of the emergency doctrine. *Id.* (citing *United States v. Russell*, 436 F.3d 1086, 1092

2    (9th Cir. 2006)).  The court "appreciated the risk of a 'false positive' emergency call and

3    recognized that a show of police force in response to a prank call is a substantial intrusion

4    on the lives of the prank's victims."  Nevertheless, the court refused to impose a duty to

5    inquire on the police to separate a true cry for help from a less deserving call for attention

6    because the delay may cost lives that could have been saved by an immediate police

7    response." *Id.* at 953-54.  The court held: "The possibility that immediate police action will

8    prevent injury or death outweighs the inconvenience we suffer when the police interrupt our

9    ordinary routines in response to what turns out to be a non-emergency call."  *Id.*

10        Plaintiffs do not dispute that the 911 call by their neighbor included all the 911-call

11   indicia of reliability.  The neighbor gave his name and identifying information, subjecting

12   himself to prosecution for false reporting; he gave a detailed, allegedly first hand, report of

13   violent activities occurring spontaneously across the street from his home.  Plaintiffs argue,

14   instead, that when Defendants pulled in front of their quiet home on their quiet street,

15   Defendants should have questioned the reliability of the neighbor's 911 call.  And, certainly

16   the emergency exception based on the reliability of the 911 call disappeared when both

17   Plaintiffs, husband and wife, came to their door appearing to have just been woken from

18   sleep. Both were scantily clad and obviously not concealing any weapons. Defendants could

19   see neither Plaintiff was injured.  No sounds came from within the home; all was quiet.

20   Plaintiffs are correct, the 911 call did not suggest there were multiple people screaming and

21   yelling; the neighbor had reported only that he heard a man and woman screaming and

22   yelling and threatening each other.  Even under *Russell*, relied on by Defendants, law

23   enforcement officers are required to take additional steps if they otherwise lacked reasonable

24   grounds to believe there is an emergency.  *Russell*, 436 F.3d  at 1091-92.

25        Construing the facts in favor of the Plaintiffs, once Plaintiffs opened their door and

26   stepped out on the porch with their hands up, officer safety became a moot point.  Once

27

28                                              15

1  Defendants were able to observe the Plaintiffs, nearly naked, unarmed, and half asleep, there

2  was no reasonable basis for Defendants to conclude the Plaintiffs were an imminent threat

3  to them.  Any officer safety justification for Plaintiffs' seizure disappeared and there was no

4  basis for Defendants to continue pointing guns at the Plaintiffs or to handcuff them.  "In fact,

5  even markedly less intrusive police action has been held to constitute an arrest when the

6  inherent danger of the situation does not justify the intrusive police action. *Lambert*, 98 F.3d

7  at 1187 (citing *Robertson*, 833 F.2d at 781 (finding arrest where numerous police drew guns

8  and detained suspect but suspects were not handcuffed and were in a police car for 5– 15

9  minutes).

10  The deposition of Sheriff Reay, the officer who handcuffed the Plaintiffs, reflects the

11  Defendants lacked any articulable basis to believe the Plaintiffs posed a threat to officer

12  safety, but for the 911 call.  *See* (Reay Depo. (Doc. 35-1) at 64-65 (failing to identify any

13  specific fact that indicated Plaintiffs could be a danger to himself, he responded that there is

14  always a probability of something happening; describing the reason he believed a gun-shot

15  victim might be in Plaintiffs home as "the unknown" fact that someone  might be injured

16  inside the residence).  Conjecture about what may or might happen is insufficient to establish

17  the heavy burden of proving an exception to the Fourth Amendment warrant requirement.

18  *United States v. Struckman*, 603 F.3d 731, 744 (9th Cir. 2010) (citing *United States v.*

19  *Howard*, 828 F.2d 552, 555 (9th Cir. 1987); *United States v. Licata*, 761 F.2d 537, 543 (9th

20  Cir. 1985)).

21  In *Sandoval*, the officer expressed his officer safety concerns in general terms that

22  could apply to any interaction involving suspects in a home: there were multiple rooms

23  where suspects could run to and "possibly ambush us" or "kill us." "Construing such

24  testimony as justifying entry would eviscerate the warrant requirement and support

25  warrantless entry in every home burglary or prowler situation." *Sandoval*, 756 F.3d at 1164.

26  The court held: "Simply invoking the unknown in these circumstances is not sufficient." *Id.*

27

28                                                              16

Defendants offer no other basis, except the 911 call, to believe that Plaintiffs posed a threat to officers or others.  Construing the facts in favor of the Plaintiffs, the Court finds that from the moment Plaintiffs opened the door, no reasonable innocent person in these circumstances, which included facing three police officers with drawn weapons, being handcuffed, questioned for 15 minutes and detained for 45 minutes, would have felt free to leave after a brief period of time.  The seizure was a full blown arrest, without probable cause and a violation of the Fourth Amendment.  For purposes of considering qualified immunity, the Court does not need to consider Plaintiffs assertion that Defendants had a duty to check the FORCE database in route to the call scene. The reasonableness of this failure by Defendants remains to be decided at trial.

Illegal Search or Emergency Exception

The search was equally unconstitutional.  When the Plaintiffs opened their door and stepped out, the indica of reliability for the 911 call disappeared.  The 911 call reported a man and woman screaming and threatening to shoot each other, but both stood before the Defendants, unharmed.  Both appeared to have been woken up from sleeping.  Both denied any altercation, and denied hearing any screaming or gun shots.  Defendants are wrong in asserting that "they could not assume that nothing had happened based on their observations, given the nature of the 911 call."  (MSJ (Doc. 49) at 14.)  Once officers made their own observations that called the reliability of the 911 call into question, Defendants were required to take additional steps to determine whether there was an emergency justifying their entry into Plaintiffs' home.  "It is clear, "if police officers otherwise lack reasonable grounds to believe there is an emergency," they must "take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place." *Hopkins*, 573 F.3d at 765.

Here, Plaintiffs assert the Defendants should have taken additional steps "– which could have included knocking on the Larsons' door, or phoning into the dwelling, or loud hailing the dwelling, or taking the few seconds, initially, to pull up the caller's information

in their own [FORCE] database, which definitively identified [the neighbor] as a delusional, repetitive 911 reportee." (Resp. to MSJ (Doc. 54) at 1-2.) Not only did officers have direct access to the FORCE database in their cruisers, *id.* (citing Ds' SOF (Doc. 51) ¶ 14), but it is protocol for the dispatcher to notify responders enroute information such as whether or not there is a "caution alert" out on the caller, *id.* (citing Reay Depo. (Doc. 35-1) at 97: 5-10). "[O]n this particular night, something broke down and the dispatcher neither relayed such information nor did any Defendants request the information from the dispatcher, *id.* at 4. Defendants knew the dispatcher could secure a published phone number for a resident address, but Defendants did not ask the dispatcher to attempt to find a telephone number for Plaintiffs. (MPSJ (Doc. 47) at 11 (citing Reay Depo. (Doc. 35-1) at 72)). Defendants also could have taken the additional step of asking Plaintiffs for permission to enter the trailer to confirm whether there was a gunman or gun-shot victim inside.

Plaintiffs complain that "no one took up [the neighbor's] offer to speak directly with him (SOF [(Doc. 48)] ¶¶ 56-57)." (MPSJ (Doc. 47). The Court notes, however, that when Defendants did finally talk to him, the conversation resulted in Defendants repeating the same "call out and containment" operation and clearing three more innocent citizens from the trailer next to Plaintiffs' trailer. (SOF (Doc. 48) ¶¶ 103-110). The Defendants could have taken additional steps to ascertain the indica of reliability for the 911 call such as comparing the facts reported by the caller with the facts discovered on the ground. Not only was the neighborhood quiet in comparison to the callers report of screaming and yelling, he reported a vehicle "flying" onto the property but Defendants did not check the hood of the truck parked at the Plaintiffs' trailer to see if the engine was warm (MPSJ (Doc. 47) at 11). Defendants failed to note that the caller had said he could not identify the man or the woman because he was afraid to look out his window. (Resp. to MSJ (Doc. 54) at 12.)

Based on the Defendants' personal observations, and construing the facts observed by the Defendants in favor of the Plaintiffs, any reasonable officer would have found the 911

1   call to be an insufficient reason to believe there was a gun-shot victim or shooter in

2   Plaintiffs' trailer.  Therefore, Defendants violated the Forth Amendment by entering the

3   Plaintiffs' trailer without taking additional steps to determine that an emergency did exist.

4   **Clearly established rights**

5          The Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular

6   – not to define clearly established law at a high level of generality." *City and Cnty of San*

7   *Francisco v. Sheehan*, 135 S.CT. 1765, 1775-76 (2015) (citing *Ashcroft v. al–Kidd*, 131 S.Ct.

8   2074, 2084 (2011); *cf. Lopez v. Smith*, 135 S.Ct. 1, 3–4 (2014) (per curiam )). "Qualified

9   immunity is no immunity at all if 'clearly established' law can simply be defined as the right

10  to be free from unreasonable searches and seizures." *Id.*

11         The right must **not** be stated as a broad general proposition, but rather must be defined

12  with enough specificity to put a reasonable officer on notice that his conduct is unlawful.

13  *Ford v. City of Yakima*, 706 F.3d 118, 1195 (9th Cir. 2013); *Saucier*, 533 U.S. at 202.  The

14  Supreme Court does "not require a case directly on point, but existing precedent must have

15  placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083.

16         To determine whether the law was "clearly established," the Court reviews all

17  available decisional law including decisions of state courts, other circuits, and district courts

18  to determine whether the right was clearly established.  *Vaughan v. Ricketts*, 859 F.2d 736,

19  739 (9th Cir. 1988), *cert. denied*, 490 U.S. 1012 (1989).  The Court begins the inquiry by

20  looking to binding precedent so if the right is clearly established by decisions of the Supreme

21  Court or this Circuit, the inquiry comes to an end.  *Hopkins*, 573 F.3d at 772.

22         In the Ninth Circuit since *Hopkins* in 2009, the Fourth Amendment law involving

23  search and seizure has been clearly established, under both Supreme Court and circuit law

24  in the context of the emergency exception to the Fourth Amendment requirement.  "Every

25  case in this circuit that has upheld a warrantless search of a home under the emergency

26  exception has involved significantly more evidence of an emergency than is present here."

27

28                                                  19

*Id.* at 766. (including history of cases: *Cervantes*, 219 F.3d at 885–86, (searching officer had been trained to recognize the smell of highly combustible fumes associated with methamphetamine production and personally smelled those fumes emanating from an apartment after responding to a call from the fire department); *United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir.2003) (a mother who had just been arrested for possessing methamphetamine told the police that her nine-year old son was home alone in the middle of the night); *Martin v. City of Oceanside*, 360 F.3d at 1080 (officers entered a house in response to a phone call from a father who called the police with an urgent welfare-check request by a father on his daughter, whom he had been unable to reach for several days); *United States v. Martinez*, 406 F.3d at 1162–64, (in the unique context of the highly volatile domestic abuse call, officers arrived to find woman crying on the front lawn of a house and heard a man shouting from inside justified warrantless entry to speak to the screaming and potentially injured male); *Stafford*, 416 F.3d at 1068, 1071–73 (maintenance man reported to police that the walls of an apartment were covered in blood and feces and that he smelled what he thought was a dead body); *Russell*, 436 F.3d at 1090 (series of confused 911 calls suggested that one individual had shot another inside a house and that the shooter was still inside when the officers arrived); *United States v. Snipe*, 515 F.3d at 949, ("very hysterical sounding" 911 caller screamed "get the cops here now!")).

In *Hopkins*, the court held that a statement that someone's breath smelled like alcohol is not even remotely comparable to the information previously deemed in this circuit to constitute "reasonable grounds" for suspecting a medical or other life-threatening emergency due to the onset of a diabetic coma. The officer asserted that he entered Hopkins home because he believed that, underline(hypothetically), any time an officer receives a report of alcohol consumption, that officer would, in his discretion, have reasonable grounds to enter a home without a warrant in order to investigate a diabetic emergency. The court held: "Whatever this understanding of the Fourth Amendment might be called, it cannot be called 'objectively

reasonable.' Thus, the emergency exception cannot justify the warrantless entry into Hopkins' home." *Id.*  In *Hopkins*, there was no evidence that he was diabetic.  The court held it had made it clear, "if police officers otherwise lack reasonable grounds to believe there is an emergency, they must take additional steps to determine whether there is an emergency in the first place." *Hopkins*, 573 F.3d at 765 (relying on *Russell*, 436 F.3d at 1092).  In *Hopkins,* officers violated the Fourth Amendment because they failed to take the additional steps of attempting to reach the man by telephone to do a welfare check or ask the third-party witness questions that might distinguish the odor she smelled from alcohol to instead be caused by a diabetic condition.  *Id.* at 764-65.

In *Sandoval*, the court held that the "officer safety" analysis has fallen under the rubric of case law applicable to the emergency exception to the Fourth Amendment since the Supreme Court issued its decision in 2006 in *Brigham City* and in the Ninth Circuit since the *Snipe* decision in 2008.  *Sandoval*, 756 F.3d at 1163.

In *Sandoval*, the court applied what it held to be the "well established law" in a case similar to this case.  The court found there was no emergency exception.  In *Sandoval*, officers received a 911 call from a neighbor, reporting two white males ages 18 and 20, one carrying a skateboard, had jumped the neighbor's fence and started looking through the window.  There had been a recent pattern of youths burglarizing the neighborhood. *Id.* at 1157.  Police responded to the home of the Sandovals knowing the reported crime was a serious criminal offense, burglary, which is considered to carry an inherent risk of violence. *Id.* at 1158, 116 3.

Officers found the house with open windows, doors and gates; nothing identifying any point of entry suggesting a burglary.  They saw three younger looking teenage boys, who were Hispanic.  Through the open window, one officer pointed a gun at the head of one of the boys.  Confusion transpired thereafter, with an officer giving orders to the boys such as

21

1    "don't move" and "turn down the music."[6] *Id.* at 1159.  A second officer entered the home

2    upon seeing the first point his gun and hearing the commands being given through the

3    window because he believed it was necessary to "control the suspects." *Id.*  Officers ordered

4    the boys to exit the bedroom, which they did.  When one boy asked to put away the family

5    dog, a pit bull, he was told no.  Instead, she was shot as she followed the boys from the

6    bedroom.  The boys were handcuffed as they exited the home.  Officers began questioning

7    the boys and allowed their father, the homeowner, to be called.  When he arrived, he was

8    handcuffed in a manner causing severe pain, denied pain medication he needed due to a

9    recent major back surgery, and detained in the back of a police cruiser.

10       In *Sandoval*, the court held the record "stands in stark contrast to cases in which we

11    have held, under the emergency aid exception, that officers had an 'objectively reasonable

12    basis for concluding that there was an immediate need to protect others or themselves from

13    serious harm.'" *Id.* (quoting *Snipe*, 515 F.3d at 952) (relying on *Michigan v. Fisher*, 558 U.S.

14    45. 45-46 (2009) (per curium) (applying emergency exception where report of "a man going

15    crazy" and police arrived to find a household in chaos, including broken windows and blood

16    on door and on hood of truck and could see man inside the house); *Ryburn*, 132 S. Ct. at 988,

17    990, 992 (police arrived at home of student who reportedly threatened to "shoot up" a school

18    and that weapons were in the home, and found mother's behavior suspicious)).

19       In *Sandoval*, the court found it distinguishable that when police arrived at the home

20    they found evidence consistent with lawful or unlawful activity, but no evidence of weapons,

21    violence, or threats.  Police had only the 911 report of a violent offense, burglary, and the

22    court found this insufficient and held that the law was clearly established requiring police

23

24       [6]The Court notes that when weapons are drawn this type of confusion may result in

25    a deadly mistake, therefore, officer competency is critical because qualified immunity
   protects government officials "for mistaken judgments by protecting all but the

26    incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224,

27    227 (1991).

28                        22

officers to take further inquiry when they do not have reasonable grounds to believe that there is an emergency at hand.

The cases relied on by Defendants do not confuse or lessen this basic requirement. In *Russell,* the police had conflicting and confusing evidence, both as to the 911 calls and at the scene, that an emergency existed. In 2008 in *Snipe*, 515 F.3d at 953-54, the court extended *Russell* to an emergency call that did not come in on a 911 system and, therefore, lacked the indicia of reliability generally associated with 911 calls which can be authenticated in respect to the identity of the caller.  In *Snipe*, the court reasoned there was still a basis to conclude the caller had an emergency in part because when officers arrived in response to the "hysterical male" caller, who instructed the dispatcher to "get police over here now," they found an open door, one officer who lived down the street did not recognize a car in the driveway or a man entering the house– then they knocked and announced their presence before entering the residence through the open door.

In *Terry-Crespo*, the totality of the circumstances consisted of a 911 call that another man had threatened the caller with a handgun and the man was a 20-year old Hispanic male, attired "like a gang member" with a white hat and blue jersey brown jacket and backpack, and a second reported the man was in the parking lot of a specific motel.  One officer arrived on the scene to find a man matching the description in the parking lot of a motel.  The court found the 911 calls exhibited sufficient indicia of reliability, even though the caller had failed to fully identify himself, to provide reasonable suspicion for a *Terry* stop of the man in the parking lot.  Assuming the *Terry*-stop standard applies, here,[7] even under the cases relied on

---

[7]There is a question whether *Terry* applies in the context of being seized within your home because there is no place where the Fourth Amendment applies with greater force than in our homes, our most private space which for centuries has been regarded as "'entitled to special protection.'"  (MPSJ (Doc. 47) at 7 (quoting *Georgia v. Randolph*, 547 U.S. 103, 115 and n.4 (2006)); *LaLonde*, 204 F.3d at  954.  The Court is confidant, however, that the analysis regarding the indicia or reliability for purposes of determining reasonable suspicion for a *Terry* stop are applicable for the purpose of determining

1    by the Defendant, the 911 call must have had an indicia of reliability to provide Defendants

2    with a reasonable basis to believe Plaintiffs posed a threat to officer safety or to believe there

3    was a gun-shot victim or shooter in Plaintiffs' home.

4         In 2010, the Ninth Circuit in *Struckman* considered police officers' failure to make

5    a minimal inquiry at the outset, which would have easily dissipated any probable cause that

6    a burglary was being committed.  *Struckman*, 603 F.3d at 746 (citing *cf Radvansky v. City

7    of Olmsted Falls*, 395 F3d 291, 305 (6th Cir. 2005) (police may not make hasty,

8    unsubstantiated arrests with impunity, nor turn a blind eye to exculpatory evidence known

9    to them)).  It is clearly established that a lack of information will not provide an articulable

10   basis upon which to justify a protective sweep.  *United States v. Colbert*, 76 F.3d 773, 777-78

11   (6th Cir. 2006) (citing *Delgadillo-Vekasqyez*, 856 F.2d at 1298 (officers had no information

12   that any other persons were in the apartment); *United States v. Akrawi*, 920 F.2d 418, 420-21

13   (6th Cir. 1990) (sweep of second floor unconstitutional where arrest occurred on first floor

14   and officers could point to no specific basis for believing anyone posed a threat from the

15   second floor)). Since 2009, it has been clearly established, "if police officers otherwise lack

16   reasonable grounds to believe there is an emergency, they must take additional steps to

17   determine whether there is an emergency in the first place."  *Hopkins*, 573 F.3d at 765.

18        While the law clearly established that the Fourth Amendment did not <u>require</u> the

19   Defendants to confirm the reliability of the 911 call,[8] *Russell,* and clearly established law

20   does not even require law enforcement officers to confirm the reliability of an anonymous

21   tip, *Snipe*, the law is equally clear that further inquiry is required where police lack a

22   reasonable basis to believe there is a threat of violence to themselves or others.

23

24   _____

25   whether there is a reasonable basis to conclude there is an imminent threat of violence for
     application of the emergency exception.

26        [8]The question remains for trial, whether as a matter of fact Defendants should have

27   confirmed the reliability of the 911 call by checking the FORCE data base.

28                                          24

Importantly, the Defendants base their entire defense on the 911 call.  They point to no other evidence suggesting the existence of an imminent threat of violence. In this case, the 911 call lacked indicia of reliability once Defendants arrived at the scene to find no evidence of unlawful activity and instead found evidence of lawful activity, which was contrary to and in conflict with the 911 call.  Defendants failed to take additional steps to determine whether there was an emergency in the first place.  Applying clearly established law, a reasonable police officer under the totality of the circumstances as alleged by the Plaintiffs, would have known there was no reasonable basis to believe there was an imminent threat of violence to the officers or others.

The law regarding use of force in respect to officer safety has unquestionably been clearly established in respect to the use of guns and handcuffs.  "In *Robinson v. Solano Cnty*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc), police officers were found to have used excessive force when they drew a gun and pointed it at the head of an apparently unarmed misdemeanor subject."  *Sandoval*, 756 F.3d at 1165.  Here, construing the facts in favor of the Plaintiffs, they were unarmed innocent citizens.

As noted in *Sandoval*, 756 F.3d at 1166, since *Merideth v. Earth*, 342 F.3d 1057, 1061 (9th Cir.2003), police officers have been on notice that it is an excessive use of force to handcuff, remove from their residence, and detain compliant persons not suspected of any crime, or alternatively to cause excessive pain while handcuffing someone.  In *Meredith*, an agent was not entitled to qualified immunity where he handcuffed a nonviolent resident of a house during an IRS search of the premises, and further that he was not entitled to qualified immunity where there was a genuine issue of fact as to whether he handcuffed the resident in a manner that caused her pain. *Id.* (citing *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir.2013) (detaining a suspected misdemeanant may violate the Fourth Amendment where there is an insufficient basis to conclude that there is a "likelihood for ongoing or repeated danger or escalation," and listing cases) (internal

1  quotation marks omitted)).  *Meredith* reaffirmed *Tekle v. United States*, 511 F.3d 839,

2  845–47 (9th Cir. 2006), that "handcuffing substantially aggravates the intrusiveness of a

3  detention," *Merideth*, 342 F.3d at 1062, and it must be justified by the totality of the

4  circumstances, *id.* at 1063, and after *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994),

5  a "detention conducted in connection with a search may be unreasonable if it is unnecessarily

6  painful." *Sandoval*, 756 F.3d at 1166.

7      Since *Lambert* in 2006, it has been clear that the emergency exception for officer

8  safety does not operate to protect law enforcement officers from all risk; the Fourth

9  Amendment does not require law enforcement officers to take **unreasonable** risks. *Lambert*,

10  98 F.3d at 1186-87.  In *Lambert* the court explained why handcuffing or pointing a weapon

11  at a suspect does not automatically convert an investigatory stop into an arrest with a balance

12  being struck between guarding against violence and guarding the Fourth Amendment,

13  "specifically the freedom from unreasonable searches and seizures." *Id.* at 1187.  By the

14  nature of their job, law enforcement officers agree to subject themselves to some physical

15  jeopardy "that is inherent in the job of a law enforcement officer." *Id.*  But, "it is the nature

16  of a democratic society that all of us, especially the police, take some risks in the interest of

17  preserving freedom." *Id.*  Therefore, balanced against the need for officer safety, is the right

18  of all people to be free from the terrifying and humiliating experience of being pulled from

19  their cars [or homes] at gunpoint, handcuffed, or made to lie face down on the pavement

20  when insufficient reason for such intrusive police conduct exists." *Id.*

21      The Court finds that clearly established law gave Defendants fair warning that the

22  emergency exception to the Fourth Amendment right to be free from an unreasonable seizure

23  and search is narrow and only applies when there are reasonable grounds to believe an

24  emergency exists, i.e., that there is an imminent threat of violence to officers or others.

25  Clearly established law gave Defendants fair warning to not rely on a lack of evidence or on

26  unreliable evidence as reasonable grounds to believe an emergency exists in the first place,

27

28                                                    26

and that when reasonable grounds do not exist to believe there is an imminent threat of violence to officers or others, police are required to conduct further inquiry. Defendants had fair notice that without reasonable grounds to believe an emergency existed, a warrantless search and seizure is presumptively unreasonable and a violation of the Fourth Amendment.

**Conclusion: No qualified immunity and material questions of facts for trial**

Construing the facts in favor of the Plaintiffs, an objectively reasonable officer would have questioned the reliability of the 911 call upon arriving on the quiet street in front of Plaintiffs' quiet and darkened trailer.  An objectively reasonable officer would have known under clearly established law that further investigation was needed to determine whether an emergency existed in the first place before directing the maximum amount of force available to him at potentially innocent citizens. Construing the facts in favor of the Plaintiffs, once Plaintiffs opened the door and stepped out onto the porch, an objectively reasonable officer would have known there was no basis to believe Plaintiffs posed any threat to officer safety. The Court finds that based on clearly established law, an objectively reasonable officer would have known there was no reasonable basis to believe there was an imminent threat of violence to themselves or others.  Defendants are not entitled to qualified immunity because, construing the facts in favor of the Plaintiffs, an objectively reasonable officer would have known they were violating Plaintiffs' Fourth Amendment rights.  Where qualified immunity is denied, given the fact-specific nature of the reasonability analysis, summary judgment should be granted sparingly. *Boyd*, 374 F.3d at 778–79; *LaLonde*, 204 F.3d at 960.

Defendants would have the Court carve out the Defendants McMurrich and Serrano and grant them summary judgment on the unlawful seizure claim because they did not participate in the detention of the Plaintiffs. (MSJ (Doc. 49) at 12.) The facts, however, even those alleged by the Defendants, reflect the Defendants acted together.  They all surrounded the trailer, with their weapons drawn.  Three Defendants were at one door and two at the other.  They all pounded on the side of the trailer, yelling for the occupants to come out.  It

1  was fortuitous which door the Plaintiffs answered, but the evidence arguably reflect the

2  seizure was by Defendants' design.

3       The conduct of all the Defendants is relevant, especially because the determination

4  of objective reasonableness is based on a totality of the circumstances, including the

5  reasonableness of the quantum of force directed at the Plaintiffs.  It matters how many

6  officers were present.  *Lambert*, 98 F.3d at 1190.  If an officer is alone and outnumbered it

7  may be prudent to approach suspects with a gun drawn.  *Id.* (citing *United States v. Serna-*

8  *Barreto*, 842 F.2d 965 (7th Cir. 1988)).  Whereas, in *United States v. Ceballos*, 654 F.2d 177

9  (2nd Cir. 1981) the court found it was excessive for numerous policemen to approach and

10 surround a single suspect with guns drawn.  *Lambert*, at 1190 (citing *see also United States*

11 *v. Thompson,* 906 F.2d 1292, 1297 (8th Cir. 1990) (finding presence of seven squad cars

12 factor in determination regarding the intrusiveness of the actions taken by police against two

13 suspects in a car.))  The Court finds material questions of fact exist regarding the objective

14 reasonableness of the Defendants' belief that Plaintiffs needed to be seized at the point of a

15 gun and handcuffed based solely on the 911 call.

16      The Court denies Plaintiffs summary judgment as well.  Defendants must be afforded

17 the opportunity to present evidence that might persuade a jury to find that this 911 call was

18 so specific in detail that objectively reasonable law enforcement officers would have believed

19 it even in spite of contrary evidence being observed upon arriving at the scene.

20 ***Sheriff Dupnik: Municipal liability for failure to train and/or supervise***

21      "Liability under section 1983 arises only upon a showing of personal participation by

22 the defendant."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  A police chief's

23 individual liability hinges upon his participation in the deprivation of constitutional rights.

24 *Larez v. Los Angeles*, 949 F.2d 630, 645 (9th Cir. 1991).  There are no allegations, here, that

25 Sheriff Dupnik, personally, participated in any way in any aspect of the alleged arrest or

26

27

28

excessive use of force on May 23, 2013.  His liability, if it exists stems from his official supervisory capacity over the Pima County Sheriffs Department (PCS).

"A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Larez*, 949 F.2d at 646.

> There are limited circumstances in which a local government will be held liable because it inadequately trained or supervised its employees, who then infringed upon a plaintiff's constitutional rights. (citations omitted).  To be successful, a plaintiff must demonstrate that: (1) the government inadequately trained or supervised its employees; (2) the failure to train is an official policy; and (3) the policy caused the employees to violate plaintiff's rights. (citations omitted).

*Thomas v. Roberts,* 261 F.3d 1160, 1173 (11th Cir. 2001).

The standard for official liability for failure to train is deliberate indifference. Plaintiffs must prove that the need for more or different training was so obvious to Sheriff Dupnik that it can reasonably be said that he was deliberately indifferent to the need. *Miranda v. Clark County*, 279 F.3d 1102, 1110 (9th Cir. 2002).  Deliberate indifference can not be established by a single incident.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989).

Here, there were two incidents.  Defendants used the same operational procedures at Plaintiffs' home and then went next door and did it again.  Defendants attest that they acted in conformance with their training and departmental policy and procedures.  (Reay Depo. (Doc. 35-1) at 54-55).  Defendant Dupnik is the policymaker for the Pima County Sheriffs' Department.  As such, he speaks for the Department, which by attestation has made the deliberate choice to endorse the officers actions on that night.  (PCS Spokesperson Depo. (Doc. 42-1) at 49, 55).  This is enough to create a material question of fact regarding the prevalence of Fourth Amendment violations when PCS officers lack a reasonable basis to believe there is an emergency in the first place, especially given the officers drew their weapons on and handcuff innocent citizens.

1   A widespread pattern is a "policy." "A 'policy' is a deliberate choice to follow a
2   course of action . . . made from among various alternatives by the official or officials
3   responsible for establishing final policy with respect to the subject matter in question.'"
4   (MPSJ (Doc. 47) at 5 (quoting *Long v. Cnty of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.
5   2006). It is undisputed that Defendant Dupnik has authority to establish policy for the PCS
6   in respect to officer training and operational procedures. "[A] plaintiff seeking to impose
7   liability on a municipality under § 1983 must identify a municipal policy or custom that
8   caused the plaintiff's injury." "A custom or practice can be inferred from . . . evidence of
9   repeated constitutional violations for which the errant municipal officers were not discharged
10  or reprimanded." *Hunter v. Cnty of Sacramento*, 652 F.3d 1225, 1232-33 (9th cir. 2011). It
11  does not matter that Plaintiffs have not pointed to a specific written policy or procedural
12  manual. The endorsement of the procedures utilized at Plaintiffs' home by the PCS and
13  evidence of the "identical incident" occurring at the adjacent trailer is evidence upon which
14  reasonable jurors might find a widespread practice or custom existed at PCS causing Fourth
15  Amendment violations when officers lack a reasonable basis to believe there is an emergency
16  in the first place.

17       **Accordingly,**

18       **IT IS ORDERED** that the Plaintiffs' Motion for Partial Summary Judgment (Doc.
19  47) is DENIED.

20       **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment
21  (Doc. 49) is DENIED.

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED** that the parties shall file their Joint Proposed Pretrial Order (PTO) within 30 days of the filing date of this Order.  The case is trial ready. Subsequent to the parties filing the PTO, the case will be set for a Pretrial Conference to set the trial date.

DATED this 8th day of September, 2015.

David C. Bury
United States District Judge

31